1 | Thomas W. McNamara
mcnamarat@ballardspahr.com
2 | 655 West Broadway, Suite 1600
San Diego, California 92101-8494
3 | Telephone: 619-696-9200
Facsimile:  619-696-9269

4

*Court-Appointed Receiver*

5 | Andrew W. Robertson (SBN 62541)
robertsona@ballardspahr.com
6 | Daniel M. Benjamin (SBN 209240)
benjamind@ballardspahr.com
7 | Ballard Spahr LLP
655 West Broadway, Suite 1600
8 | San Diego, California 92101-8494
Telephone:  619-696-9200
9 | Facsimile:   619-696-9269

10

*Attorneys for Receiver*

11

12 | UNITED STATES DISTRICT COURT

13 | CENTRAL DISTRICT OF CALIFORNIA

14

15 | FEDERAL TRADE COMMISSION,

16 | Plaintiff,

17 | v.

18 | ASSET & CAPITAL MANAGEMENT GROUP, et al.,

19 | Defendants.

20

CASE NO. SACV13-1107-DSF (JCx)

**PRELIMINARY REPORT OF RECEIVER**

JUDGE:   Hon. Dale S. Fischer
CTRM:    840

21

22

23

24

25

26

27

28

Case No. SACV13-1107-DSF (JCx)
PRELIMINARY REPORT OF RECEIVER

FILED
CLERK, U.S DISTRICT COURT

AUG - 5 2013

CENTRAL DISTRICT OF CALIFORNIA

# Table of Contents

**Page**

I. Introduction ........................................................................................................1
II. Receivership Activities ....................................................................................3
    A.    Receivership Defendants' Sites ..........................................................3
        1.    21478 Harvill Avenue, Suite 1, Perris, CA .............................4
        2.    1520 Brookhollow Drive, Suites 41 & 42, Santa Ana, CA ........9
        3.    6700 Indiana Avenue, Riverside, CA ....................................11
        4.    573 S. Monterey Pass Road, Suites D & E, Monterey
            Park, CA..........................................................................12
    B.    Financial Accounts of Receivership Defendants ..............................18
    C.    Documents/Information/Electronic Data ...........................................20
    D.    Forensic Accountants ........................................................................20
    E.    Compliance with TRO ......................................................................20
III. Can These Businesses Be Operated Lawfully and Profitably? ........................21

# PRELIMINARY REPORT OF RECEIVER

## I.

## Introduction

On July 24, 2013, this Court entered a Temporary Restraining Order with an Asset Freeze and Other Equitable Relief ("TRO") which appointed me, Thomas W. McNamara, Receiver ("Receiver") for the business activities of Receivership Defendants.  Receivership Defendants are defined in the TRO (Paragraph K, page 6) as the Corporate Defendants named in the Complaint (Asset and Capital Management Group, Crown Funding Company, LLC, One FC, LLC, Credit MP, LLC, Western Capital Group, Inc., SJ Capitol, LLC, and Green Fidelity Allegiance, Inc.), "as well as any successors, assigns, affiliates, and subsidiaries that conduct any business related to the Defendants' debt collection business and which the Receiver has reason to believe are owned or controlled in whole or in part by any of the Defendants."

We have located at least some of the sites where Receivership Defendants currently conduct business and have suspended their debt collection operations consistent with the terms of the TRO.  Based upon our investigation to date, we can now provide a preliminary snapshot of the structure and operations of these businesses.

At the outset, I must report to the court that Individual Defendants Thai Han, Jim Tran Phelps, and Keith Hua have been entirely uncooperative, have breached most of their obligations to provide information and access to the receivership, and have participated in the removal and/or destruction of evidence and receivership property.  Messrs. Han, Phelps, and Hua have seriously hampered our ability to fully and accurately report the scope and status of the Defendants' operations to the Court.  At this point, I do not know whether the evidence (computer and hard copy) has been permanently destroyed or merely hidden.  We continue to insist that Messrs. Han, Phelps and Hua comply with their obligations to cooperate and

comply with the TRO.  In that regard, we will be filing an Order to Show Cause why they should not be held in Contempt of Court for their obstructive conduct.

I am pleased to report that Individual Defendant James Novella has been highly cooperative and candid at every level.  Additionally, while the primary representative of Defendant SJ Capitol was initially uncooperative, she now appears to be meeting her duties in complying with the TRO.

Section XIV of the TRO specifically directs that I report to the Court on six specific topics prior to the date set for the hearing to Show Cause regarding Preliminary Injunction.[1]  As to those topics, I can report as follows:

(1)     **Steps taken by the Receiver to implement the TRO.**  I have indefinitely suspended all operations of the two Receivership Defendants with active debt collection operations we have located – SJ Capitol, LLC and Green Fidelity Allegiance, Inc.  The deceptive practices which violate the Fair Debt Collection Practices Act and the FTC Act are so ingrained in their operations that this is the only feasible vehicle for immediate implementation.  As to the other named Receivership Defendants and Related Entities identified in the TRO, I have not located any current on-going debt collection operations.  While it appears that they were active on a large scale until mid-2012 and thereafter wound down operations, I cannot say this with conviction because the actions of Messrs. Han, Phelps and Hua have prevented me from fully understanding and investigating the operations.

(2)-(3) **Receivership Defendants' assets and liabilities.**  We have identified liquid assets, which are now frozen or have been deposited into a receivership bank account as set forth below in Section II.B.  We do not yet have a calculation for overall liabilities.

---

[1]   We learned mid-day August 5, 2013, that the Preliminary Injunction hearing was continued from August 6, 2013 to August 20, 2013 – we are filing this report in compliance with the initial timetable and will supplement the report, if necessary, prior to the continued hearing date.

(4)   **Receiver's assessment of whether the business can be operated profitably and legally.**  The debt collection businesses operated by Receivership Defendants are not *per se* illegal.  The basic business model – buy bank debt at deep discounts and then collect the debt directly from consumers – is not uncommon for entrepreneurs who calculate that net collections will exceed the discounted cost of the debt and operating costs to collect.  But, the collection tactics deployed by these Receivership Defendants are deceptive and illegal and account for a large part of their collection success.  These could, in theory, be lawful businesses, but only with substantially higher operating expenses (to insure lawful practices) which would impair profitability – this, in turn, would require additional capital, which is not available through the receivership.  I conclude, therefore, that these businesses cannot be "lawfully operated at a profit using the assets of the receivership estate."  (TRO, Section IX(N).)

(5)-(6)   **Any future steps the Receiver recommends and Other matters which the Receiver believes should be brought to the Court's attention.**  These matters are set forth below in this Preliminary Report.

## II.

## Receivership Activities

### A.    Receivership Defendants' Sites

As directed and authorized by Section X of the TRO, at approximately 1:45 p.m. on Wednesday, July 24, 2013, I, along with my team, commenced the process of securing access to the three business premises identified in the TRO (one in Orange County and two in Riverside County).  We later identified, and secured access to, an additional site in Monterrey Park, California which contained an office for Receivership Defendant Crown Funding and related entities and an adjoining office for an additional Receivership Defendant – AFK Solutions, LLC which is owned by Defendant Keith Hua.  The details of each site are set forth below.  After taking control of the offices, I provided access to the FTC and the

Defendants consistent with the directives of the TRO.

       1.        21478 Harvill Avenue, Suite 1, Perris, CA

SCG Office

This site is occupied by Defendant SJ Capitol, LLC d/b/a SCG ("SCG") Approximately 15 employees were present when we entered. The owner, Shenea January, was not present. We immediately took control of the premises, asked the employees to fill out questionnaires, obtained computer passwords, and interviewed the employees willing to speak with us. One of the employees, believed to be Ms. January's daughter, called her mother, and asked her to come to the office.

The employees of SCG informed our team that Ms. January was the person in charge. Ms. January's assistant, and perceived second in charge, was Shameka, who had been in the office that morning, but had left before the Receiver's team arrived. The remainder of the employees present were employed as debt collectors, either "Dialers" or "Closers." Several of the employees were brand new to the business, with at least one having started just that day. The employees were not aware of – or chose not to share information about – any other offices or other people involved with SCG.

Ms. January later came into the office with an acquaintance. Ms. January was initially very difficult and refused requests to cooperate that day and refused express requests to identify all SJ Capitol bank accounts and her computer password. When offered the opportunity to remove personal items, she sought to remove corporate records. However, on July 28, she reached out to the Receiver's counsel and did answer his questions that day about her operations, and subsequently has answered our further inquiries. Thus, while we were initially concerned as to her compliance, at this point, based upon the facts known to us, she appears to be in compliance with the TRO.

///

SCG subleases the Harvill Avenue offices from Defendant Western Capital Group, Inc. ("WCG"), which commenced in August, 2012. The suite has approximately 3,900 square feet of space and contains approximately 36 telemarketer cubicles and one executive office. Scripts were hung on the cubicle walls and high-earning employees were featured on a bulletin board. The employees confirmed they were paid on commission based on the dollar volume of debt recovered. A commission schedule was located in most of the cubicles.

SCG also maintained at least two mail drops – one is a UPS Store at 25920 Iris Avenue, Ste. 13A #325, Moreno Valley, CA 92551 and one is a Postal Annex at 75 W. Nuevo Road, Ste. #E-138, Perris, CA 92571. Those locations were served with a copy of the Temporary Restraining Order.

SCG Structure

SCG was formed by Ms. January as a California corporation in 2008 or 2009. Initially, it was the vehicle through which she operated as a debt collector, and later as a manager, for WCG. When WCG purported to close its doors in or about May 2012, Ms. January used SCG to start her own debt collection call room in the same space used by WCG, using the same methodology, and funded in part by an owner of the common enterprise. SCG filed a Fictitious Business Name Statement in Riverside County in June, 2012, listing Harvill Avenue as its address and Ms. January as President. SCG also operated under other names – all with the initials SCG – including Southern Capital Group (using the Nuevo Road address) and Spirit Capital Group (using the Iris Road address).

Ms. January incorporated JF Trinity Fundings, LLC ("Trinity") in the name of her daughter, Jamesha Fairley in July, 2012. Ms. Fairley is listed on the incorporation documents as the CEO/Operating Manager, while Ms. January is listed as the Secretary and Treasurer. Trinity served as the debt acquisition arm of SCG – it never had any separate corporate assets or income. Ms. January communicated with debtor sellers, primarily Jefferson Exchange Group, from a

Trinity email address.  We saw evidence of debt purchases by Trinity between September 2012 and May 2013 with pricing ranging from 2% to 4% of the face value of the debts acquired.

### Call Room Operations

SCG's collection operation was broken into three components:  (1) accounts were prepared ("worked") to develop detailed contact information on the debtors from multiple online sources and calls ("PSD" calls supposedly from process servers and "Lit" calls supposedly from a law office); (2) collection letters were sent offering options for resolution before "turning this matter over to our Legal Partners;" and (3) telephone collection calls by "Dialers" and "Closers."

Scripts for all variants of telephone calls were found at their cubicles.  These scripts featured false threats of imminent service of a complaint and other deceptions:

- "Ok looks like our office has acquired a case against you and you are in the process of being sued. … It do[es] show this was filed as a civil matter, what that means it that at the court hearing the judge or the attorney are not there to discuss the matter with you judge is just there to grant judgment based on the validation that the attorneys will present.  Once judgment has been granted it is sent over to your last known place of employment to begin wage garnishment immediately. …"  (Appendix, Ex. 1.)

- "I'm calling from the Process Service Division.  We have a field agent scheduled to deliver sealed documents in the process of being served to you."  (Appendix, Ex. 2.)  This is an example of a "PSD" call.

- "There has been a case and complaint filed in our office against you and there is a pending law suit[] in place at this time.  We sent out documentation with time and date for you to appear in court. …. I verified with the process [service] division that they have made th[eir]

first attempt to serve you. Now as long as you have not been served I can still assist you, once you have been served there is nothing I can do…" (Appendix, Ex. 3.) This is an example of a "Lit" call.

• "We are notifying you because we are in the process of sending out a[] field agent to hand deliver documents to you. I am calling to verify that someone will be available between the hours of 9am to 4pm Monday – Friday who can [accept] documents on your behalf." (Appendix, Ex. 4.)

• "There has been a case filed in our office against you. Your case is now being handled by the attorney and I do show that he needs to speak with you regarding your upcoming court appearance. Please hold and I'll transfer you over to him now." (Appendix, Ex. 5.)

Some of the scripts were directed at employers. For example, one script read:

• "Hello can I speak with the immediate supervisor of (debtor's name). Hi my name is ___ I'm calling from the process verification department. I have legal documents in the process of being served to one of your employees. I need to verify if you have any policies or procedures that you would like us to follow upon arriving. Pause. Ok what I would like to do is save ___ the embarrassment of having an officer come out. If you can have her [] contact the issuing agency to …discuss other options to serving her I place a hold on this for 2 hours. The number she needs to call is ___." (Appendix, Ex. 6.)

The callers were also provided with scripted rebuttals. One of the scripted questions was: "What do [you] say [when] the [debtor] asks [you] where is the case filed and [why] is there no public records of this matter?" The scripted response was:

///

"[I]t's filed in your county you will have to actually wait for the documents and it will give you all the information. If they ask how come you can't tell me? Advise them because actual[ly] you normally wouldn't speak to them at this point but because they have not been served if they want to resolve you will still work with them." (Appendix, Ex. 7, p. 2.)

At the end of each dialer's call, the scripts called for the caller to provide a phone number for additional information and/or account payment assistance – that number directed the consumer to a Closer who occupied a nearby cubicle. Closers were tasked to take consumer calls and make deals with consumer payments usually coming by way of credit card payments over several months.

We saw no compliance manuals and no one identified any to us. We also saw no attempt at compliance. To the contrary, callers were instructed to lie to debtors – some cubicles contained a list of the various states' statutes of limitations. In regards to this, Ms. January sent out an email stating: "please make a note that when you have an account that is past statu[t]e of limitations that you do not give debtors the charge off date that you see. You should give debtors the date that will allow you to stay within the statute of limitations." (Appendix, Ex. 8.)

We saw evidence that Dialers played audio of police scanners as background noise to provide a law enforcement atmosphere to their calls, reporting that a marshal or sheriff was trying to serve them.

<u>Connections to Other Defendants</u>

Ms. January was compensated by Defendant Western Capital Group while working as a collector and manager, 2009-2012. We also located a UMS Banking Credit Card Merchant Statement dated July 2012 for Defendant Thai Han/LMR addressed to him at the Harvill Avenue address.

In June, 2012, Stewart Phillips, a former, and possibly a current, owner of Defendant Crown Funding and/or its related affiliates, invested $20,000 in SJ Capitol.  When a dispute arose as to Mr. Phillips' role, Mr. Phillips instructed Jefferson Exchange Group, SCG's primary source for debt, to hold all contracts for new debt purchases.  It appears that the parties later negotiated a settlement in April 2013, but we have not yet confirmed if that settlement was finalized.

### Financial

SJ Capitol has few assets and is a modest business with little or no profits. Collections are roughly $40,000 to $60,000 per month with minimal profits.  IT and telephone services are provided by AFK Solutions owned by Defendant Keith Hua.

### 2. 1520 Brookhollow Drive, Suites 41 & 42, Santa Ana, CA

The Brookhollow Drive site is headquarters for Defendant Green Fidelity Allegiance, Inc. ("Green Fidelity").  The space totals approximately 2,500 square feet with cubicles for three private offices and work stations for approximately 19 telemarketers.  Fifteen telemarketers were present at the time we arrived.  We interviewed several members of the telemarketing staff, reviewed documents onsite, and interviewed the site's manager and owner, Defendant James Novella. Mr. Novella was extremely cooperative from our first meeting and has continued that cooperation since.  The employees onsite were also cooperative, completed questionnaires and departed.

The telemarketing staff is split between "Dialers" (11) and "Closers" (3), all using assumed names when dealing with debtors over the telephone.  Typically, the Dialers call debtors from a list of names and phone numbers provided by Novella. Working from a script, they contact debtors posing as a legal processor server attempting to serve "legal papers."  They are purposefully vague about the "legal papers" as they pose as a neutral third-party process server.  When the debtor inquires about the reason for the service of legal papers, they are

1   encouraged to call the "company" which hired the server, which in truth is just a

2   Closer in a nearby cubicle.

3       The Dialers' scripts differ somewhat, but most of them state that the Dialer

4   is calling on behalf of some entity (*e.g.*, "Brown Legal Services," "Investigative

5   Services," "the Clerk's office," "the filing firm," "Legal Support Services") with

6   respect to efforts to serve the debtor with legal documents (sometimes identified as

7   a "summons"), and, in some cases, the scripts suggest that that if the debtor does

8   not respond to the telephone number provided, they will be served with legal

9   papers at their workplace.  None of the scripts we reviewed indicated that any

10  Dialer identified their association with Green Fidelity.  The representations that the

11  debtor was to be served with legal papers are false, simply a deceptive strong-arm

12  tactic to "encourage" the debtor to call one of the Closers.

13      Debtors who call into the Closers are asked whether they are aware "that

14  there is a legal matter being filed against you."  The Closers do not identify

15  themselves as Green Fidelity employees, but instead claim to be "an assistant here

16  in the litigation department," and suggest that the debtor might participate in a

17  voluntary resolution of the matter (by disingenuously claiming "I can try to contact

18  my manager and the attorneys overseeing this file and ask if they are willing to

19  work with you on a voluntary basis").  In the event a debtor does not make an offer

20  of payment, the Closer may threaten to file a 1099-C form with the IRS.

21      Our review of scripts and other materials onsite revealed that both Dialers

22  and Closers were systematically deceiving debtors and violating multiple

23  provisions of the Fair Debt Collection Practices Act ("FDCPA").   Appendix,

24  Exhibits 9-14 are samples of such scripts found onsite.

25      Green Fidelity maintains very informal accounting systems and records.  No

26  full-time accounting personnel are onsite.  A part-time person handles payroll and

27  payables and processes statements from credit card service bureaus handling

28  collection payments from consumer debtors.  An outside contract accountant

prepares some financial statements based on bank statements and checkbook activity provided by Defendant Novella.  We found limited bank statements for Green Fidelity, MADA Loyalty Group, a related Novella entity, and Hush Lah, Inc., a Novella entity which owns Suites 41 and 42 as an office condominium.  Our preliminary review indicates that Green Fidelity and its predecessor MADA Loyalty are modest and perhaps unprofitable businesses.  Collections run at about $25,000 to $30,000 per month, which is quickly expended for overhead costs and the acquisition of debt.  We found no evidence of any direct ownership interest by other Defendants.   However, AFK Solutions, owned by Defendant Keith Hua, provides IT and telephone support services.

3.    6700 Indiana Avenue, Riverside, CA

This site is currently the office of Global Pacific Financial Services ("Global Pacific") and three related entities – Coastal Elite Funding, LLC ("Coastal"), First Quality Financial Services, LLC ("First Quality"), and Western United Financial Services, LLC ("Western United").  We will collectively refer to these four entities as the "Global Pacific Entities."

The TRO authorized immediate access to this location as it was a previous location for a debt collection business operating through United CC Holdings, LLC, which is identified in the TRO as a "Related Entity."  After a thorough onsite investigation, however, I ultimately concluded that the Global Pacific Entities are not subject to the receivership as they are not named Defendants or named Related Entities and I have not found dispositive evidence that they are owned or controlled by any Defendant. Rather, it appears that Wayne Swanson, the principal of the Global Pacific Entities, was a former employee of United CC Holdings – when it ceased operations in May, 2012, Swanson saw an opening to launch his own debt collection business.  He incorporated the four Global Pacific Entities in June, 2012, entered into a sublease for the office space, and acquired the infrastructure of phones, computers and furniture from the vendor (AFK Solutions)

who had provided it to United CC Holdings.

The Global Pacific Entities are conducting a debt collection business very similar to the businesses of named Defendants and are deploying some of the deceptive and illegal practices described in the FTC's Complaint and evidence in support of the TRO application. Like Green Fidelity and SG Capital, this is a modest business with limited profitability.   But, as parties not named as Defendants, Receivership Defendants or Related Entities in the Complaint or the TRO, they are outside the reach of the FTC's current action and the TRO.

### 4.    573 S. Monterey Pass Road, Suites D & E, Monterey Park, CA

We took possession of this site on Wednesday July 31, exactly one week after we secured immediate access to the three locations identified in the TRO. This delay was attributable to (1) the overt deception of Individual Defendants Han and Phelps who simply failed to identify this site as a current business premise for Defendant Crown Funding and related entities; and (2) the lack of cooperation from Individual Defendant Keith Hua who simply chose not to cooperate with the receivership.

Almost immediately after entering the three debt collection sites described above back on July 24, we began efforts to gain compliance by Messrs. Han, Phelps and Hua.  I personally contacted Mr. Han on Wednesday afternoon and asked for an opportunity to meet with him to understand the business operations. The following morning, Thursday, July 25, my counsel and I met with Messrs. Han and Phelps in the offices of their corporate attorney.  I walked them through the provisions of the TRO, particularly those sections which required their cooperation and those that described the asset freeze.  They did not want to talk further at that point.  I was told that they were in the process of retaining FTC counsel and that I should hear from them before the day was out.

Later that day, I contacted Defendant Hua.  He told me he was in the process of retaining counsel and a little later I was contacted by an attorney with Katten,

Muchin.  She explained that they were in the process of being retained.  I explained what I needed and what I believed the TRO required of her clients immediately.[2]  I was promised quick cooperation.   Unfortunately, despite my telephone calls and an email reminder, I did not hear further from the Katten firm until Monday afternoon.  At that point, they indicated they were representing Defendants Han and Phelps and the Corporate Defendants (except Green Fidelity and SJ Capitol).  A short while later, I heard from an attorney with another firm who indicated she was in the process of being retained by Defendant Hua.

Over the next two days, the Katten firm engaged in a meaningful dialogue with my team.  We had lengthy conference calls on Tuesday and then Wednesday, July 30 and 31, in which the Katten attorneys made a number of representations regarding Defendants Han and Phelps and their Corporate Defendants.   Of particular importance to me were their representations that: (1) their clients had NO operating business location, (2) any hard copy documents were located at Defendant Han's residence, and (3) electronic data was contained on a laptop computer the location of which was somewhat hazy.  These representations were extremely significant to me as the TRO Section X provides that the defendants must ***immediately identify*** all business addresses, all non-residence premises where debt collection related activities are conducted, and all non-residence locations where documents or electronically stored information is hosted, stored or maintained.

By Wednesday morning July 31, 2013, we had been unsuccessful in securing any cooperation from Individual Defendant Keith Hua, although we had been advised by attorneys in Washington, D.C. that they were in the process of formalizing a retention engagement.  Given that one week had passed and we had seen no cooperation, I made the decision that it was my duty under the TRO to

---

[2] The attorney was not sure that Katten would represent all three Individual Defendants as there was a potential for a conflict between Hua, Han, and Phelps.

proceed to Mr. Hua's known place of business.  We also knew that Mr. Hua was the principal of AFK Solutions, LLC ("AFK") which provided IT and telephone support services to each of the three sites identified in the TRO – as such, AFK fell within the definition of Receivership Defendant in the TRO as it conducted a business related to Defendants' debt collection business and which I had reason to believe was owned or controlled in whole or in part by any of the Defendants. Based on invoices we found on site at the other locations, we identified the business location of AFK as 573 S. Monterey Pass Road, Suite E, in Monterey Park.

I left my office late morning and arrived at this site between 2:30 and 3:00 p.m.  During the drive up from San Diego, I participated in one of the lengthy calls (described above) with the Katten attorneys, which concluded at about 2:30 p.m., near the time I arrived in Monterey Park.  At that point, I received an email from Hua's counsel (who were still in the process of being retained) identifying the address I was at as one of Hua's business locations.  As I sat in the parking lot in front of the office, I emailed counsel and called Defendant Hua asking for the key to the location so that I would not have to engage a locksmith to drill the locks.

As I sat in my car engaged in a heated conversation with counsel about whether the key would be provided, much to my astonishment Defendant Han arrived by car along with another individual that I later learned was Jason Lam. They got out of their car carrying a number of folded bankers boxes, clearly intent on removing materials from the site.  When Mr. Han saw me, he stopped.  I asked him to wait until I concluded my call and he did.  In the meantime, he contacted his counsel on his mobile phone.  When I completed my call, I asked him to not enter the site and, having apparently received the same instruction from his counsel, he agreed.

In a subsequent call with the Katten firm, I learned that Defendant Han was not intent on removing items from Hua's Suite E, but instead intended to remove

items from the adjacent suite, Suite D.  Up to that point, Suite D had not been disclosed as a business location.  The Katten attorneys seemed genuinely shocked at the turn of events – particularly since not much more than an hour earlier they had represented – based upon their clients' representations to them – that their clients had *no* operational business locations and that all business documents were at Han's home.  A short time later, they had Mr. Han return with a key to Suite D so that I could access the office.  The following day the Katten firm withdrew as counsel.

Suite D

Upon entering Suite D, it became clear that Messrs. Han and Phelps lied about a number of items which were critically important to the receivership and my report to this Court.  This office appears to be an all-purpose back office for Crown Funding and its related entities.  It consists of one large open office with three L-shaped desks.  While the first two desks both had dual screen monitors, ***the desktop computers were missing***.  The drawers for these two desks were also empty.  The third desk had a desktop computer, but the password was missing.  Additionally, a laptop charger was on the desk, but the ***laptop computer may be missing***.  I immediately demanded the return of the desktops and have repeated the demand since.  As of yet, nothing has been provided.

Suite D appears to provide back office support for various entities (see Corporate Defendants and Related Entities in the TRO).  We located corporate books, corporate checks, deposit stamps, federal and state tax documents, agreements, invoices and receipts.  For example, the corporate books, corporate checks, deposit slips and/or deposit stamps for the following entities were present: American FP, LLC; American PG, LLC; Asset Portfolio Partners, LLC; Asset & Capital Management Group; Bureau of Asset Management, Inc.; Capital FC, LLC; Capital FP, LLC; Capital IG, LLC; Capital Recoveries, Inc.; Credit MP LLC; Crown Funding Company LLC; First FF LLC, dba PPVC; First FG, LLC; First FS

LLC, dba PMCV; First Planners United, LLC; Freeman United Holdings, LLC, dba LMP; Global AG, LLC; Global Holding Services, LLC; Han Dynasty, Inc.; Heinz Capital Financial LLC, dba TRDV; International Capital Holdings Insurance; Leon Solutions Services, LLC; National FC, LLC; National FC, LLC, dba ARPA; National IG LLC, dba NAAC; New Capital Holdings, Inc.; National Services Partners, LLC; One FC, LLC; OIG, Inc.; P & P Group Insurance; Pacific Holding Partners, LLC; Portfolio MG, LLC; Portfolio MG, LLC, dba HNRE; Premier PG LLC, dba KRS; Revere Recovery Group, LLC; United CC Holdings, LLC; United CC, LLC; United Holding Services, LLC; United Services Partnership, LLC, dba NAR; Western Capital Group Inc., dba LMR.

In June, 2012, it appears that certain entities ceased operations. For example, American FP, Capital IG, First Planners United, Global Holding Services, National Service Partners, One FC, Revere Recovery Group, LLC, United CC Holdings, United Service Partners, and Western Capital Group and many of their employees entered severance agreements. Additionally, there were numerous notices of unemployment claims dated on or about June 1, 2012. Based on United States Postal Service confirmation letters, the mail was sent to P.O. Box 15848, Santa Ana, CA 92375.

The office also contained records of the purchase and sale of delinquent accounts from multiple debt vendors and their subsequent resale to multiple debt collection operators.

Finally, the office housed multiple file cabinets that included records for certain entities, often with each entity receiving its own file cabinet drawer. The documents include tax records, bank statements and reconciliation reports, invoices, bills and receipts, agreements and leases, and employee applications and files for the following entities: Asset Capital Management Group, Inc.; American FP, LLC; Capital FC, LLC; Capital IG, LLC; Capital Recoveries, Inc.; Credit MP, LLC; Crown Funding Company, LLC; First Planners United LLC; Global AG

LLC; Global Holding Services LLC; Las Vegas Funding and Financial LLC; National Services Partners LLC; New Capital Holdings, Inc.; One FC, LLC; Revere Recovery Group, LLC; United CC, LLC; United Services Partnership LLC; and Western Capital Group.

Suite E

On August 3, 2013, at approximately 4:00 p.m., Keith Hua finally provided the alarm code for Suite E, which appears to be where AFK Solutions, LLC operates. Prior to that, I had secured the space late in the day on July 31, but had been unable to enter it without the alarm sounding; Mr. Hua and his then counsel ignored numerous prior requests for the code.

The front part of the office consists of two desks. Each desk has a computer monitor, keyboard and mouse, but the desktop computers are missing. The drawers of these desks and two four-drawer file cabinets appeared to have been cleaned out.

The rear of the office appears to be an IT services operation, which includes multiple desktop computers, computer parts, telephones, telephone systems, and battery backups. It also includes multiple server racks. However, except for networking equipment (*e.g.*, cable modem, firewall, and network switches) and one server, the server racks were empty. All that remains are the cables to operate the missing servers (*e.g.*, ethernet cables, power cables and KVM cables).

The few documents that were present in Suite E included the corporate books for AFK Solutions, LLC, the initial documents for Bank of America accounts for AFK Solutions, LLC, corporate checks and deposit slips for Technology Services & Solutions, LLC and deposit slips for KPT Enterprises LLC.

In short, it is obvious that Defendants Han, Phelps and Hua have obstructed this Court's order. They took it upon themselves to hide, remove and likely destroy evidence and receivership property in spite of being fully informed of the

scope and requirements of the TRO.  Our efforts to suggest, request and demand compliance have been ignored.  Our efforts to secure the receivership estate have been hobbled and our ability to fully report to the Court handicapped.[3]

**B.     Financial Accounts of Receivership Defendants**

Beginning July 24, 2013, my team served the TRO on banks where Receivership Defendants, both those named in the Complaint and those I later determined to fall within the definition in the TRO, were known to have accounts. The following accounts with positive balances have been frozen:

| Account Holder | Financial Institution | Acct. Ending In | Amount Frozen |
|---|---|---|---|
| Asset & Capital Management Group | Bank of America | 5269 | $37,023.68 |
| Crown Funding Company LLC | Bank of America | 5264 | $758,614.28 |
| Green Fidelity Allegiance, Inc., dba WRA | Bank of America | 7853 | $22,333.34 |
| Western Capital Group, Inc. | Bank of America | 5277 | $102,558.56 |
| Credit MP, LLC dba AFGA | Bank of America | 3637 | $51,481.17 |
| One FC, LLC dba WPG | Bank of America | 8155 | $90,473.77 |
| Thai Han and Sarah Han | Bank of America | 5118 | $12,102.85 |
| Jim Tran Phelps | Bank of America | 0485 | $19,490.84 |
| Keith Hua | Charles Schwab & Co. Inc. | 9932 | $20.56 |
| American FP, LLC dba ABA | Bank of America | 5272 | $36,504.55 |
| Asset Portfolio Partners, LLC | Bank of America | 2778 | $41,982.17 |
| Capital FC, LLC dba PCSG | Bank of America | 5271 | $2,742.25 |

---

[3]  Han, Phelps, and Hua have retained new counsel and our initial contacts with counsel are encouraging.  Counsel believes they will be in a position to provide some of the items removed by Han, Phelps, and Hua to us tomorrow.  At this point, we cannot place much reliance on this proposal, as Defendants – as opposed to counsel – have shown no respect for the TRO up to this point.

| Account Holder | Financial Institution | Acct. Ending In | Amount Frozen |
|---|---|---|---|
| Capital IG, LLC dba PFG | Bank of America | 5270 | $72,322.08 |
| First CG Inc. | Wells Fargo | 3891 | $502.87 |
| First CG Inc. | Wells Fargo | 4912 | $5,193.81 |
| First Planners United, LLC | Bank of America | 6075 | $55,903.69 |
| Global AG, LLC | Bank of America | 4465 | $40,191.14 |
| Global Holding Services, LLC dba NFR | Bank of America | 6067 | $108,827.02 |
| Han Dynasty, Inc. | Bank of America | 4087 | $9,464.50 |
| Hush Lah, Inc. | Bank of America | 7600 | $85.27 |
| New Capital Holdings, LLC | Bank of America | 2073 | $9,149.93 |
| One World Film Ventures, LLC | Wells Fargo | 8879 | $3,465.08 |
| Revere Recovery Group, LLC | Bank of America | 6263 | $26,119.98 |
| United CC Holdings, LLC dba LAR | Bank of America | 5276 | $94,595.74 |
| United Services Partnership LLC | Bank of America | 2811 | $184,482.48 |
| United FP Inc. | Wells Fargo | 1445 | $1,263.70 |
| United FP Inc. | Wells Fargo | 0995 | $665.50 |
| Web Audict | Wells Fargo | 8895 | $162,611.16 |
| Web Audict | Wells Fargo | 0537 | $174.35 |
| **TOTAL** | | | $1,950,346.32 |

Other than the money in these accounts, Receivership Defendants do not appear to have substantial other liquid assets, but our investigation as to assets is still in its preliminary stages.

///

### C.      Documents/Information/Electronic Data

Upon taking possession of the sites, my team confirmed that hard copy documents were secure.  I retained a forensic computer firm which worked with the FTC's subcontractor to make images of the servers and certain desktop computers at the Perris and Santa Ana sites – I believe that we have control of the available electronic data relating to Receivership Defendants' operations at those sites.  As noted above, as to the Monterey Park sites, Defendants Han, Phelps, and Hua have prevented me from securing records and electronic data.

### D.      Forensic Accountants

I retained Thad Meyer, CPA and President at Alliance Turnaround Management, Inc. ("Alliance") to lead the forensic accounting investigation and to reconstruct the financial activities of Receivership Defendants.

### E.      Compliance with TRO

Once we secured the premises and completed a basic review of the business, I took immediate steps to insure compliance with the TRO as follows:

1.      Our overriding goal was to take all steps needed to achieve compliance, while also trying to protect the consumer to the extent possible.

2.      All collection activities were suspended by excusing all collection personnel – "Dialers" – who had previously made outbound calls to consumers and "Closers" who primarily responded to inbound callers.  We placed voicemail messages on the sales lines alerting consumers to the suspension and directed them to the Receiver's website.

3.      I have reserved a Receivership website (www.wpgreceiver.com), which will serve as a vehicle to communicate with former employees and consumers.

///

///

///

# III.

## Can These Businesses Be Operated Lawfully and Profitably?

Paragraph VIII (N) of the TRO tasks me to determine if the businesses of Receivership Defendants can be operated lawfully and profitably. As to SJ Capitol and Green Fidelity, which appear to be the only Receivership Defendants with current operations, my conclusion is no.

A critical predicate for any review of debt collection operators is a clear understanding of the regulatory landscape. Those regulations are detailed in the FTC's filings with the Court. The starting point is the Fair Debt Collection Practices Act ("FDCPA"). It is designed to prevent unfair and deceptive practices associated with debt collection. Section 5 of the Federal Trade Commission Act ("FTC Act") also prohibits generally unfair or deceptive practices affecting consumers. By any standard, these Receivership Defendants have embraced deceptive and unfair practices as central to their business model – the central deception is that they are connected to some sort of formal legal action that has been, or will be, filed to collect a debt.

Based upon the facts and law identified above, to become lawful going concerns, these debt collection businesses must implement a sea change in all operations, start over with compliant correspondence, scripts, and procedures, and implement sophisticated compliance procedures.

If these businesses were run lawfully, profitability would be severely challenged. If collection sales personnel were carefully trained and supervised to deploy only lawful collection tactics with no deception, we expect that alone would slow sales dramatically, and would increase expenses for hiring, training, and supervision. Given that the entities' present assets were largely collected through unlawful collection tactics, substantial new capital would be needed to fund a fully compliant operation which would then face a business pro forma with substantially

1   lower profit margins.  To put it simply, this scenario is not a realistic option for this

2   Receivership.

3

4   Dated:  August 5, 2013           THOMAS W. MCNAMARA

5

6                         By:

                            Thomas W. McNamara

7                           Receiver

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**
*FTC v. Asset & Capital Management Group, et al.*
USDC Central District of California
Case No. SACV13-1107-DSF (JCx)

I, Jill Jacobs, declare as follows:

I am an employee of a member of the bar of this Court at whose direction was made in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 655 West Broadway, Suite 1600, San Diego, California 92101-8494.

On August 5, 2013, I served the following document(s) described as:

- **PRELIMINARY REPORT OF RECEIVER**

on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof enclosed in sealed envelopes as follows:

**VIA EMAIL & U.S. MAIL**                      *Attorneys for Plaintiff*
Seena D. Gressin
Gregory A. Ashe
Michael D. White
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel.:  202-326-2717 (Gressin)
Tel.:  202-326-3719 (Ashe)
Tel.:  202-326-3196 (White)
Fax:   202-326-3768
Email: sgressin@ftc.gov,
gashe@ftc.gov, mwhite1@ftc.gov

**VIA EMAIL & U.S. MAIL**                      *Attorneys for Plaintiff*
Maricela Segura
Federal Trade Commission
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Tel.:  310-824-4343
Fax:   310-824-4380
Email: msegura@ftc.gov

**VIA EMAIL & U.S. MAIL**                      *Attorneys for Asset & Capital*
Pamela Tsao                                    *Management Group; Crown Funding*
Katten Muchin Rosenman LLP                     *Company, LLC; Western Capital Group,*
2029 Century Park East Suite 2600              *Inc.; Credit MP, LLC; One FC, LLC;*
Los Angeles, CA 90067                          *Thai Han; and Jim Tran Phelps*
Tel.:    310-788-4560
Fax:     310-712-8269
Email: pamela.tsao@kattenlaw.com

☒ **BY EMAIL**: I caused the documents to be sent to the persons at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

1  ☒ **MAIL** to non-ECF participants by causing a true copy thereof to be placed in a sealed envelope with postage thereon fully prepaid to be placed in the United States
2  mail at San Diego, California addressed as indicated above. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It
3  is deposited with the U.S. Postal Service on that same day in the ordinary course of business.

4
☐ **VIA CM / ECF** by electronically filing the foregoing with the Clerk of the
5  District Court using its ECF System, which electronically notifies them via email as indicated above.

6
☐ **FACSIMILE** by causing such document to be transmitted by facsimile machine
7  to the office(s) of the parties indicated herein. The facsimile machine used complied with Rule 2003 and no error was reported by the machine.

8
☐ **FEDERAL EXPRESS** by causing a true copy thereof to be placed in a sealed
9  envelope addressed to the office(s) of the parties indicated herein below fully prepaid to be placed in Federal Express delivery service box at 655 West Broadway, San
10  Diego, California. I am "readily familiar" with this firm's practice of collection and processing correspondence for Federal Express service. It is deposited with Federal
11  Express on that same day in the ordinary course of business.

12  ☐ **PERSONAL SERVICE** by causing a true and correct copy of the aforementioned document(s) to be delivered to the parties on the attached service list
13  this date by Nationwide Legal, Inc.

14  ☐ (STATE): I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

15
☒ (FEDERAL): I declare that I am employed in the office of a member of the bar
16  of this court at whose direction the service was made.

17          Executed August 5, 2013, in San Diego, California.

18

19          Jill Jacobs

20

21

22

23

24

25

26

27

28